# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MARTHA S. HARVALA,

Plaintiff,

v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

Defendant.

No. 14 C 1176

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Martha S. Harvala filed this action seeking reversal of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq. The parties consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this Opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp.

2d 973, 977 (N.D. Ill. 2001).[1] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The standard for determining DIB is virtually identical to that used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on September 21, 2010, alleging that she became disabled on June 3, 2010, because of problems related to fibromyalgia, arthritis, scoliosis, carpal tunnel syndrome, and anemia. (R. at 12, 64). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 12, 64–73, 76–77). On August 27, 2010, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 12, 26–61). The ALJ also heard testimony from Edward Pagella, a vocational expert (VE), and Gary Harvala, Plaintiff's husband. (*Id.* at 12, 26–61, 124).

The ALJ denied Plaintiff's request for benefits on September 17, 2012. (R. at 12–21). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since June 3, 2010, her alleged onset date. (*Id.* at 14). At step two, the ALJ found that Plaintiff's fibromyalgia,[2] bilateral carpal tunnel syndrome, mild lumbar degenerative disc disease,[3] and obesity are severe impairments. (*Id.* at 14–15). At step three, the ALJ de-

---

[2] "Fibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues. Researchers believe that fibromyalgia amplifies painful sensations by affecting the way your brain processes pain signals. . . . In the past, doctors would check 18 specific points on a person's body to see how many of them were painful when pressed firmly. Newer guidelines don't require a tender point exam. Instead, a fibromyalgia diagnosis can be made if a person has had widespread pain for more than three months–with no underlying medical condition that could cause the pain." <www.mayoclinic.org/diseases-conditions/fibromyalgia/basics/definition/con-20019243> [hereinafter Mayo Clinic: Fibromyalgia].

[3] Degenerative Disc Disease or Osteoarthritis or back pain is characterized by pain, tenderness, stiffness, loss of flexibility, grating sensation, and bone spurs. Symptoms tend to develop slowly and worsen over time. <http://www.mayoclinic.org/diseases-conditions/osteoarthritis/basics/symptoms/con-20014749> [hereinafter Mayo Clinic: Osteoarthritis]

termined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.* at 15–16).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[4] and determined that she can perform light work as defined in 20 C.F.R. § 404.1567(b) involving

> no climbing ladders, ropes, or scaffolding; occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs; no exposure to heights or hazards such as dangerous moving machinery or scissors; and frequent but not constant reaching and handling bilaterally.

(R. at 16). Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that Plaintiff was not capable of performing past relevant work as a barber. (*Id.* at 20). At step five, based on Plaintiff's RFC, her vocational factors, and the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including work as a hostess, usher, and information clerk. (*Id.* at 20–21). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the Act. (*Id.* at 21).

The Appeals Council denied Plaintiff's request for review on January 14, 2014. (R. at 1–3). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

---

[4] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is

weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## IV. RELEVANT MEDICAL EVIDENCE

Plaintiff has suffered from fibromyalgia since 2009. (R. at 281). On September 1, 2010, Plaintiff began treating with Heather Weber, M.D. (R. at 256–58). Plaintiff complained of excessive pain, persistent soreness, and tightness. (*Id.* at 257). She has used pain medication (Vicodin, Flexeril, Meloxicam, and Lyrica)[5] with only minimal benefit. (*Id.*). Plaintiff explained that she had reduced work to five hours, four days a week, but was unable to manage this due to the pain. (*Id.*). On examination, Dr. Weber found tender trigger points, paraspinal tension, and trapezius tension. (*Id.* at 258). She diagnosed myalgia and myositis, malaise and fatigue, depressive disorder, carpal tunnel syndrome, and back/hip/neck pain. (*Id.* at 257–58). These diagnoses remained constant throughout Plaintiff's visits. (*Id.* at 247, 277–78, 304–

---

[5] Vicodin (acetaminophen-hydrocodone) is used to relieve moderate to severe pain. Flexeril (cyclobenzaprine) is a muscle relaxant used for relief of muscle spasm associated with acute, painful musculoskeletal conditions. Meloxicam is a nonsteroidal anti-inflammatory drug (NSAID), which works by reducing hormones that cause inflammation and pain in the body caused by osteoarthritis or other forms of arthritis. Lyrica (pregabalin) is a drug used to treat fibromyalgia, which works by affecting chemicals in the brain that send pain signals across the nervous system. <www.drugs.com>

05, 308–09 (additional diagnosis of leg pain), 346–47, 354–55). An X-ray of the lumbar spine performed that same day showed bilateral osteoarthritis of the facet joints at L3-L4 through L5-S1 levels, resulting in mild to moderate spondylosis of the lumbar spine. (*Id.* at 268). An MRI performed on September 28, 2010, indicated a mild disc bulge with mild bilateral neural foraminal stenosis and a small Tarlov cyst. (*Id.* at 267).

Plaintiff underwent physical therapy from September to November 2010. (R. at 225–55). Despite these sessions, Plaintiff exhibited little change in her functional abilities over the course of therapy secondary to pain and weakness. (*Id.*). She consistently had difficulty driving secondary to neck/hand/arm pain, an inability to squat or stoop secondary to low back pain, an inability to carry laundry or groceries, and difficulty pushing and pulling doors open. (*Id.*). After five visits, Plaintiff continued to experience pain throughout her spine, shoulders, hips and hands with tightness through the lower neck, upper shoulders, and across the chest. (*Id.* at 233). She rated her pain a 6–7/10. (*Id.*). Notes from her last therapy session show limited cervical range of motion with tight left and right rotation. (*Id.* at 226). Plaintiff's lumbar range of motion for side bending and extension was limited to 25° of movement with pain each way. (*Id.*). Her lumbar range of motion for rotation was limited to 50° with pain each way as well. (*Id.*).

On January 21, 2011, Plaintiff reported to Dr. Weber that some days were hard, but most days were okay. (R. at 277). She requested a stronger dose of Vicodin to manage the pain. (*Id.*).

On January 22, 2011, Stanley Simon, M.D., performed an internal medicine consultative examination on behalf of the Commissioner. (R. at 219, 281–84). Plaintiff presented with complaints of severe body pain, especially in her shoulders, arms, hands, back, hips, and legs. (*Id.* at 281–82). She reported pain of 8/10, which is exacerbated by prolonged standing and using her hands. (*Id.* at 282). She reported that she has pain in her joints after walking one half mile or climbing one flight of stairs, pain in her feet after standing for 15 minutes, and pain in her back after sitting for 15 minutes. (*Id.*). On examination, Dr. Simon found that Plaintiff's lumbar spine extension was 5/25° with pain and flexion was 80/90° with pain. (*Id.* at 219). Dr. Simon found Plaintiff positive for all fibromyalgia trigger points and diagnosed fibromyalgia, arthritis of the back, hips, and hands, scoliosis of the back, and bilateral carpal tunnel syndrome. (*Id.* at 284).

In her June 8, 2011 follow-up with Dr. Weber, Plaintiff reported that her fibromyalgia waxes and wanes such that she has some good days and some bad. (R. at 303). Plaintiff tried to manage by working two half days per week but noticed some hand pain at times. (*Id.* at 303–04).

On July 22, 2011, Plaintiff began treating with pain specialist, Brian D. Oostman, D.O. (*Id.* at 300). She presented with complaints of low back pain which had been present for "[her] whole life" and which had worsened over the past six months. (*Id.*). The pain radiates into Plaintiff's right hip and upper leg and is aggravated by sitting, bending, and stooping and is helped by rest. (*Id.*). An X-ray on the same day revealed an unbalanced anomaly at the lumbosacral junction and de-

generative disease in the right sacroiliac joint. (R. 300–01). On physical examination, Dr. Oostman found that Plaintiff had pain with compression of her right hip, a positive FABRE test,[6] a positive standing and seating flexion test on the right, a positive straight leg raising (SLR) test[7] on the right, and tenderness in the bilateral lumbosacral areas. (*Id.* at 301–302). Dr. Oostman recommended physical therapy, heat treatment, and stretching exercises. (*Id.* at 302). In her follow-up visit on July 29, 2011, Plaintiff reported that the pain had improved since the last visit and that it no longer radiated into her arms or legs. (*Id.* at 298).

On November 9, 2011, Plaintiff reported to Dr. Weber that she had been experiencing tightness across the shoulder and back/leg pain for the past few weeks. (R. at 308). Plaintiff had to leave work early due to the pain. (*Id.* at 308).

Plaintiff underwent additional physical therapy from December 2011 to January 2012. (R. at 310–45). She presented with complaints of "leg pain bilaterally especially shooting pain bilateral in back going down the legs," soreness across her lower back, and pain in the bilateral upper trapezius, all of which are aggravated by sitting and standing too long. (*Id.* at 310). Plaintiff generally tolerated the exercises well but on December 14 and 16, 2011, she exhibited poor tolerance to resistive exercises due to pain from a fibromyalgia flare-up. (*Id.* at 323–26, 327–29). On De-

---

[6] Patrick's test or FABER test (for Flexion, Abduction, and External Rotation) "is performed to evaluate pathology of the hip joint or the sacroiliac joint." <https://en.wikipedia.org/wiki/Patrick's_test>

[7] The SLR test is used "to determine whether a patient with low back pain has an underlying herniated disk." <http://en.wikipedia.org/wiki/Straight_leg_raise> "If the patient experiences sciatic pain when the straight leg is at an angle of between 30 and 70 degrees, then the test is positive and a herniated disc is likely to be the cause of the pain." *Id.*

cember 14, 2011, she exhibited myofascial tightness/tenderness on palpation in the bilateral upper trapezius muscles and in the bilateral lumbar paraspinals and upper gluteals. (*Id.* at 328). As of January 11, 2012, Plaintiff had experienced four days with minimal pain but did experience some soreness. (*Id.* at 338). She deferred some exercises because of the pain. (*Id.*). On discharge, Plaintiff stated she continues to have good days and bad days at times but noted improved strength and improved mobility with daily activities. (*Id.* at 344).

On March 14, 2012, Plaintiff complained of pain in the hands/elbows as well as in the hip/back and commented that she had been wearing braces most of the time in an attempt to alleviate the pain. (R. at 346). That same day, at Plaintiff's request, Dr. Weber injected 40mg of methylprednisolone into the bilateral carpal tunnel spaces.[8] (*Id.* at 346–47).

On April 18, 2012, Plaintiff presented to Mohammad A. Khan, M.D., an ambulatory surgery specialist, complaining of pain in the lower back that had gotten progressively worse over the past two years. (R. at 349). Plaintiff described the pain as "sharp shooting in nature, some part of the pain [as] dull aching in nature" and as radiating along the back of the thigh down to the knee bilaterally (*Id.*). The pain fluctuates between 6–10/10 and is aggravated by movement/activity, walking, standing, lifting, taking the stairs, and driving. (*Id.*). Plaintiff reported that nothing has made the pain better despite trying physical therapy and taking medication.

---

[8] Methylprednisolone is a steroid that prevents the release of substances in the body that cause inflammation. <www.drugs.com>

(*Id.*). On examination, Dr. Khan found severe tenderness over the paravertebral muscle in the lower back and a positive Patrick test bilaterally. (*Id.* at 350). An MRI of the lumbosacral spine indicated a moderate broad-based bulging disk at L4-L5 level causing spinal stenosis due to facet joint hypertrophy. (*Id.*). Dr. Khan diagnosed chronic low back pain secondary to lumbar radiculitis, sacroiliac and facet joint arthropathy. (*Id.*). He performed a lumbar epidural steroid injection. (*Id.*). On May 2, 2012, Plaintiff reported that the injection had improved the pain for one week but that the pain had returned after that. (R. at 352). Dr. Khan decided to perform a bilateral diagnostic lumbar facet joint injection that same day. (*Id.* at 352–53).

On July 13, 2012, Ronald T. Mercante, L.C.S.W., performed a psychiatric evaluation. (R. 361–63). Plaintiff reported a recent episode where she ended up in the ER without any memory of how she got there. (*Id.* at 361). She denied extra medication, pills, or illicit drug use but later admitted to cannabis use every two to three days after the ER report showed cannabis in her urine. (*Id.* at 361–62). She stated her pain at 8/10 and worried her life was "slipping away." (*Id.* at 362). Plaintiff was tearful and emotional throughout the evaluation and explained that she feared she would lose her job despite enjoying the work, her colleagues, and her clients. (*Id.*). Mercante observed that Plaintiff experienced significant physical discomfort, needing to constantly readjust herself in the chair, and needing to get up and pace at times due to the pain. (*Id.* at 363). He found Plaintiff to be cooperative but ques-

tioned her reliability as an informant since she had not immediately admitted to using cannabis. (*Id*.).

On July 25, 2012, Plaintiff presented to psychiatrist Kathleen L. Geary, M.D., for an evaluation due to stress/depression related to her fibromyalgia. (R. at 357). Plaintiff cried most of the session. (*Id*.). She felt that her "life ha[d] been gradually deteriorating because of the fibromyalgia." (*Id*.). Plaintiff focused primarily on her fibromyalgia pain and the havoc it had continued to cause in her life. (*Id*.). She initially denied use of cannabis but then admitted to using it as a last resort to alleviate the pain. (*Id*.). Plaintiff explained that she had been working less and less over the past two years and had not gone to work at all for the past two weeks. (*Id*.). At the end of the session, she requested a doctor's note for her employer and explained that she planned on filing for disability. (*Id*.). Dr. Geary's notes remark, "This is a very unclear case." (*Id*. at 359). She found Plaintiff's nonstop focus on pain as an issue in her life troublesome and felt that bringing up disability and a doctor's letter in the first visit meant that was Plaintiff's primary reason for being there rather than improving her condition. (*Id*.). Dr. Geary also expressed concerns about drug abuse/misuse, the health of the marriage, the honesty of the patient, and manipulation. (*Id*.). She found Plaintiff had been suffering greatly but was unable to communicate the source of her pain. (*Id*.).

Throughout the hearing on August 27, 2012, Plaintiff had to alternate between sitting and standing to alleviate the pain. (R. at 37). Plaintiff testified, "The pain level of the fibromyalgia just seems to be getting worse all the time. It changes

where it affects me. . . . I do not know how much pain I'm going to be in when I get up in the morning. . . . It's very hard to explain how this disease gets hold of you . . . you can feel a couple of days that you're doing pretty well and feeling okay, but [it] changes every day. " (*Id.* at 34). Plaintiff explained that her good or bad days are unpredictable but that she likely has three or four good days each month. (*Id.* at 35). On a bad day (approximately 10 days monthly), Plaintiff ends up taking pain medication and spending most of the day in bed. (*Id.* at 44–45).

When asked about her daily activities, she responded that her husband does the cleaning, cooking, dishes, and laundry because leaning and turning motions have always been difficult for her. (*Id.* at 40). Plaintiff does not sleep well and naps most days when the fibromyalgia acts up. (*Id.* at 46). She uses a cane almost every day, especially when she feels too much pressure on her back, legs, or feet and wears a brace on each wrist and hand almost every day as well. (*Id.* at 47–48, 346).

When Plaintiff's attorney asked about her work, she explained that she had lower back problems and shooting pains in her legs when she would stand to give a 15–20 minute haircut. (R. at 41). Plaintiff could not hold the razors or scissors due to swelling and wrist pain and continuously dropped the tools. (*Id.* at 42, 282). After working for three to five hours, Plaintiff had to rest and sometimes could not do anything for two to three days due to the swollen knots in her shoulder, feet, and hands. (*Id.*).

# V. DISCUSSION

## A. The ALJ's Credibility Determination is Patently Wrong

An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); Social Security Ruling (SSR)[9] 96-7p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about

---

[9] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p.

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

Plaintiff testified that she is in constant pain and that it has worsened over time. (R. at 34). She is unable to work because of lower back problems, pain in her legs while standing, and pain in both wrists. (*Id.* at 42, 282). Because of the pain in her back, legs, and feet, Plaintiff uses a cane almost every day. (*Id.* at 47–48, 346). She likewise wears a soft back brace to alleviate the lower back pain while working. (*Id.* at 282). Because of the pain in her wrists, she wears a brace on each hand almost every day as well. (*Id.*). During the consultative exam on January 22, 2011, Plaintiff explained that she can stand for only 15 minutes before having pain in her feet and can sit for only 15 minutes before having pain in her back. (*Id.* at 282). During the hearing, Plaintiff alternated between sitting and standing. (*Id.* at 37).

In her decision, the ALJ found that Plaintiff suffers from multiple severe impairments but concluded that Plaintiff's allegations of disabling pain are not credible because of a lack of medical evidence and testimony in support. (R. at 16–18). Under the circumstances, most of the reasons provided by the ALJ for rejecting Plaintiff's credibility are not legally sufficient or supported by substantial evidence.

### 1. ALJ Erred in Finding Plaintiff's Functional Limitations Not Supported by Medical Record

Though the ALJ found that Plaintiff suffers from several severe impairments, the ALJ concluded that the degree of functional limitation allows Plaintiff to perform light work and any greater restriction runs contrary to the relevant medical evidence in the record. (R. at 20). On the contrary, the ALJ failed to account for physical therapy records documenting an inability to perform daily activities. (*Id.* at 238 (noting that patient generally stays on the main floor of the house), 225–55 (noting that Plaintiff continues to report difficulty with driving, an inability to carry items up and down stairs, an inability to carry groceries, and difficulty with other household chores), 225–55, 328, 329 (documenting minimal functional improvement throughout her sessions due to pain)).

The ALJ similarly failed to fully consider medical evidence supporting Plaintiff's contention that she is unable to sit or stand for a long period of time. (R. at 310 (reporting poor tolerance for sitting and standing), 281 (reporting an inability to stand for more than 15 minutes without feet pain, sit for more than 15 minutes without back pain, and climb one flight of stairs without joint pain), 41 (testifying that she has back and leg pain after standing to administer a 15–20 minute haircut). Fur-

ther, both the consultative examiner and the ALJ's observations of Plaintiff corroborated these limitations. (*Id.* at 363 (observing that Plaintiff needed to constantly readjust herself in her chair and get up and down due to pain), 37 (observing that Plaintiff needed to stand up during the hearing)).

### 2. *The ALJ Impermissibly Disregarded Plaintiff's Allegations of Debilitating Pain*

The ALJ erroneously concluded that the medical evidence does not support Plaintiff's allegations of debilitating pain. (R. at 16–18). On the contrary, extensive medical records, corroborated by numerous doctors, document that Plaintiff suffers from persistent pain as a result of her impairments. (*See*, *e.g.*, *id.* at 258 (finding multiple tender trigger points, paraspinal tension, and trapezius tension and diagnosing myalgia, carpal tunnel syndrome, and back/hip/neck pain), 225–55 (physical therapy notes documenting little change in functional status due to pain throughout the spine, shoulders, hips and hands, and tightness through lower neck, upper shoulders, and across the chest), 225–55 (documenting difficulty driving secondary to neck/hand/arm pain, an inability to squat or stoop secondary to low pain, an inability to carry laundry or groceries, and difficulty pushing and pulling doors open), 226 (reporting limited lumbar range of motion with pain and tightness), 219, 284 (finding Plaintiff positive for all fibromyalgia trigger points and a limited lumbar spine extension with pain and diagnosing fibromyalgia, arthritis of the back, hips, and hands, scoliosis of the back, and bilateral carpal tunnel syndrome), 301–02 (finding that Plaintiff had pain with compression of her right hip, a positive FABRE test, a positive standing and seating flexion test on the right, a positive straight leg

raising (SLR) test on the right, and tenderness in the bilateral lumbosacral areas), 323–26, 327–29 (exhibiting poor tolerance for physical therapy exercises due to a fibromyalgia flare-up), 328 (exhibiting tightness/tenderness in both trapezius muscles, lumbar paraspinal muscles, and upper gluteals), 350, 325–53 (diagnosing low back pain and performing two steroid injections)).

Further, Plaintiff's hearing testimony that she is in constant pain that "seems to be getting worse all the time" is consistent with her reports to doctors. (R. at 34, 257 (complaining to treating physician of excessive pain, persistent soreness, and tightness), 219, 281–84 (complaining to internal medical consultant of severe body pain of 8/10 which is exacerbated by prolonged standing, sitting, walking, climbing stairs, and using her hands), 300 (complaining to pain specialist of worsening low back pain which is aggravated by sitting, standing, bending, and stooping), 308 (complaining to treating physician of back/leg pain and tightness), 310–45 (complaining to physical therapist of leg/back pain aggravated by sitting and standing), 346 (complaining to treating physician of hand/elbow pain and hip/back pain), 349 (complaining to ambulatory surgery specialist of worsening lower back pain that is "sharp shooting in nature" and that fluctuates between 6–10/10), 357 (complaining to psychiatrist of fibromyalgia pain and the havoc it is wreaking on her life)).

### 3. The ALJ Did Not Properly Account for Plaintiff's Fibromyalgia

The ALJ concluded that the medical evidence does not support the degree of limitation alleged by Plaintiff because she did not exhibit any significant limitations when getting on and off the examination table or walking greater than 50 feet and

because she had normal grip strength and full range of motion. (R. at 17, 283).
However, the ALJ did not adequately explain how these findings undermine Plain-
tiff's allegations of pain. Indeed, the ability to get on and off an examination table,
walk more than 50 feet, present with "normal gait, normal grip strength, and full
range of motion of shoulders, elbows and wrists" (*id.*) is not inconsistent with persis-
tent pain caused by the fibromyalgia. There is no evidence indicating that fibrom-
yalgia causes limitations in strength, range of motion, or an inability to step onto an
examination table or walk. On the contrary, fibromyalgia is characterized by wide-
spread pain, not by an inability to walk or a decrease in range of motion. *See* Mayo
Clinic: Fibromyalgia. The ALJ assumed a connection between the tests adminis-
tered and Plaintiff's symptoms of pain. As such, in deciding that they were mutually
exclusive, the ALJ was inappropriately "playing doctor." *Engstrand v. Colvin*, 788
F.3d 655, 661 (7th Cir. 2015).

In the same vein, the ALJ found that Plaintiff's functional limitations are not as
severe as she alleges because her doctor's treatment notes indicate that she "was
functioning adequately." (R. at 17). Although the ALJ did acknowledge both that
"fibromyalgia does not result in abnormal findings, other than the requisite number
of trigger points" and that Plaintiff reported "some good and bad days," the ALJ did
not take the unpredictable nature of the bad days into account when considering
Plaintiff's credibility. (R. at 17, 303–04). The ALJ relied on the treatment note re-
porting "most days were okay" but did not mention that in the same note, Plaintiff
explained that "some days were hard" and proceeded to request a stronger dose of

Vicodin to manage the pain at bedtime. (*Id.* at 17, 277). "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

### 4. *The ALJ Did Not Properly Account for Plaintiff's Back Pain*

The ALJ opined that Plaintiff's back pain is not as debilitating as she alleges because the evidence shows that she improved after treatment. (R. at 18). The ALJ specifically relied on a July 29, 2011 (misstated as January 29, 2011) follow-up report noting that her "back pain had improved since her last visit." (*Id.* at 18, 298). The ALJ erred by handpicking which evidence to evaluate while disregarding other critical evidence. *Scrogham v. Colvin*, 765 F.3d 685, 696–99 (7th Cir. 2014); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). While the July 29, 2011 report in isolation does indicate successful treatment and noticeable improvement, the ALJ failed to acknowledge the remaining and more recent medical records that indicated Plaintiff's back pain persisted after this momentary reprieve. (R. at 308 (complaining of back pain in November 2011), 310–45 (undergoing additional physical therapy from December 2011 to January 2012 because of pain/soreness across the lower back), 346 (complaining of back pain in March 2012), 350 (finding tenderness in the lower back, diagnosing low back pain, and administering steroid injections)). The ALJ similarly ignores that Plaintiff's back problems are caused by degenerative disc disease, which is a progressive disease, the severity of which increases with time. *See*

Mayo Clinic: Osteoarthritis. The ALJ's conclusion is based on a single progress note despite ample documentation suggesting a conclusion to the contrary.

### 5. *The ALJ's Credibility Findings on Carpal Tunnel Syndrome and Depression are Supported by Substantial Evidence*

Plaintiff states that she is unable to work because her carpal tunnel syndrome causes "numbness and shooting pain." (R. at 169). At the hearing, Plaintiff testified that her hands "lock up" and swell while working. (*Id.* at 42). Nevertheless, the ALJ concluded that though Plaintiff feels pain and tingling in each wrist, her carpal tunnel syndrome does not cause any functional limitations. (*Id.* at 18). The ALJ noted "the medical evidence does not appear to have any other treating reports, records or doctor statements since July of 2010" showing complaints or concerns regarding her carpal tunnel syndrome. (*Id.*). She also noted that during the January 22, 2011 consultative examination, Plaintiff demonstrated full range of motion of her wrists and exhibited normal grip strength and a normal ability to grasp and manipulate objects. (*Id.* 18, 283). Plaintiff has not identified any evidence to the contrary. Thus, the ALJ properly discounted Plaintiff's credibility as it relates to her carpal tunnel syndrome.

The ALJ also reasonably concluded that Plaintiff's depression symptoms were not as serious as Plaintiff alleged. (R. at 19). Though Plaintiff ultimately explained that she used cannabis as a last resort to combat her pain, her failure to come forth with this information initially calls into question her credibility. (*Id.* at 19, 357). The ALJ also relied on Plaintiff's treatment records that show her depression has been well controlled and that she continues to demonstrate normal mental status

findings upon examination. (*Id.* at 246 (finding that Plaintiff is "mentally feeling better and able to cope with pain"), 277 (finding that "depression is well controlled"), 284 (finding normal mental status results on examination), 346 (finding that depression is "stable"), 354 (finding that "depression is overall improved")). For these reasons, the ALJ's credibility finding as it relates to depression is supported by substantial evidence.

The Commissioner contends that the ALJ may discredit Plaintiff's entire line of testimony because two healthcare professionals—a social worker and a psychiatrist—questioned Plaintiff's motivation and honesty after they each saw her for one appointment. (R. at 359, 363; Resp. 3–4). But the ALJ considered these opinions only in relation to her credibility finding on depression (R. at 19), as discussed above. *See SEC v. Chenery Corp.*, 318 U.S. 80, 90–93 (1943) (ruling that the court must limit its review to the rationale offered by the ALJ); *accord Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). In any event, these reports are two isolated incidents and there are internal contradictions within each report. For example, the ALJ failed to acknowledge Dr. Geary's observation that Plaintiff is "suffering greatly, but she is not able to share what the true pain really is." (R. at 359). Similarly, the social worker observed that Plaintiff needed to constantly readjust herself and walk around due to pain. (*Id.* at 363). Additionally, none of her treating physicians, physical therapists, and other doctors mentioned any concerns about her credibility over the course of treatment. Ultimately, while the ALJ's credibility finding for carpal tunnel syndrome and depression is supported by substantial evidence, the court

finds the credibility determination for Plaintiff's allegations of pain "patently wrong." *Craft*, 539 at 678.

## B. Summary

In sum, the ALJ has failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the Court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ shall reassess Plaintiff's credibility with due regard for the full range of medical evidence. The ALJ shall then reevaluate Plaintiff's physical impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of her findings in accordance with applicable regulations and rulings. The ALJ shall similarly seek appropriate expert medical advice to determine what effects Plaintiff's pain has on her ability to work. Finally, with the assistance of a VE, the ALJ shall determine whether there are jobs that exist in significant numbers that Plaintiff can perform.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [11] is **GRANTED**, and Defendant's Motion for Summary Judgment [13] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this Opinion.

E N T E R:

Dated: September 3, 2015

_____
MARY M. ROWLAND
United States Magistrate Judge

_____